COLUMBUS W. HAND, plaintiff in error, vs. JAMES W. ARMSTRONG, defendant in error.

Emancipation is no defence to notes given for the purchase money of slaves sold in 1860, with warranty "that they are slaves for life." The warrantor did not covenant against a future act of the government. He simply warranted that the slaves in question belonged to that class whose condition was, by the then law, one of bondage for life—not that this condition should continue as long as they should live.

Complaint. In Sumter Superior Court. Tried before Judge Speer. April Term, 1866.

This action was by Armstrong against Hand, to recover the amount of two promissory notes covering the purchase money of the negroes embraced in the following instrument:

"Received, January 9th, 1860, of C. W. Hand, forty-seven hundred and six 50-100 dollars, in full payment for the purchase of the following named negroes: Richard, about 20 years of age, Tona, about 23, and Catharine, about 19 years of age. I warrant the title of the above named negroes, and that they are slaves for life. I, also, warrant them sound in body and mind: *Provided* said negroes, should they prove unsound, be returned within thirty days; otherwise, the warranty as to soundness is null and void.            JAMES ARMSTRONG."

It was in evidence that the hire of the negroes, from the day of sale until their emancipation, was worth about twelve hundred dollars.

The Court charged the jury that the bill of sale was an executed contract; that the warranty therein was a covenant that the status of the slaves, at its date, was, under the law, that of slaves for life, but not that such status would not be changed by the future action of the government; and, that were it a covenant that such status should continue during the life of the slaves, the action of the government, in emancipating the slaves, had repealed it.

To this charge the defendant excepted; and the verdict being against him for the whole sum claimed, he brought the case here for review.

HAWKINS for plaintiff in error.

COBB & JACKSON for defendant.

WALKER, J.

Is the emancipation of the slaves, by the act of Government, a breach of this covenant of warranty? To be able to answer this question properly, it is necessary to understand

30

what was the contract made by the parties. The evidence of their agreement is all in writing, and the construction of the contract, in such a case, is a question for the Court. *Code* 2718. "It is a mere matter of law." 1 *T. R.* 180; 2 *Par. on Con.*, 4. The duty of the Court, in such a case, is to ascertain what is the meaning of the words the parties have used. 1 *Greenl. Ev. Sec.* 277. "The cardinal rule of construction is to ascertain the intention of the parties." *Code* 2719. "The terms of every written instrument are to be understood in their plain, ordinary, and popular sense." 1 *Greenl. Ev.* 278.

This was a contract of sale on time. Armstrong, in consideration of the two notes sued on, sold to Hand the three negroes described in the bill of sale. "A sale is a transfer of the *absolute title* to property for a certain agreed price. It is a contract between two parties, one of whom acquires thereby a property in the thing sold, and the other parts with it for a valuable consideration. A sale takes place only when there is a transfer of the title to property for a price." *Sto. on Sales*, 1. When the notes were given and the bill of sale delivered, the contract of sale was complete, and the title to the slaves was transferred absolutely to Hand. "It is certain that *merely by the bargain* the property in the goods may be altered. If one sell me his horse or any other thing for money, or other valuable consideration, and (first) the same thing is to be delivered to me at a day certain, and by our agreement, a day is set for the payment of the money; or (lastly) I take the thing bought by agreement into my possession, when no money is paid, earnest given, or day set for the payment,—in all these cases there is *a good bargain and sale of the thing to alter the property thereof.*" *Ch. on Con.*, 374⅓; 1 *Par. on Con.*, 440-1. So, in *Noy's Maxims* it is said: "If I sell my horse for money, I may keep him until I am paid, but I can not have an action of debt until he is delivered; yet the property of the horse is, *by the bargain*, in the bargainor or buyer. And if the horse die in my stable between the bargain and the delivery, I

may have an action (that is for goods bargained and sold) for my money, because, *by the bargain*, the property was in the buyer." *Ib.* 374–5. "Where two men, each owning a negro child, agreed to exchange, but the children being small, were left with their mothers till one died, it was held that, *at the time of the bargain*, there was a transfer *of the property and risk*, (though not of possession) and thenceforth the possession of each was a bailment, and he who was in possession of the living child, would be liable to the action of the other for it, without any tender, or act on the part of the latter." *Ib. note* (1) *citing* 6 *Dana* 49. *Pothier, Cont. of Sale, by Cushing, Secs.* 308, 313, *pp.* 187, 195.

When the sale was made, the notes given to Armstrong, and the bill of sale, accompanied by the possession of the negroes, to Hand, the contract, so far as Armstrong was concerned, was executed so as to vest the absolute title and property in Hand, and, in the language of the authority, "there was a transfer of the property and risk" to him. *Leonard vs. Boynton*, 11 *Ga. R.* 112–13. Armstrong owned the negroes: they were, under the Constitution of the United States, under the Constitution of the State of Georgia, and the laws of both governments, recognized and protected as property—as slaves for life. He had the right, under the constitutions and the laws, to the custody of their persons, and the proceeds of their labor: they were his property— his chattels. He sells and conveys to Hand his absolute, indisputable title to this property; and the question is, what obligation did he assume by the warranty contained in his transfer? "All warranties, however expressed, are open to such construction from the surrounding circumstances, and the general character of the transaction, and the established usage in similar cases, as will make the engagement of warranty conform to the intention and understanding of the parties: provided, however, that the words of warranty are neither extended nor contracted in their significance beyond their fair and rational meaning. For these words of warranty are usually subjected to a careful, if not

a precise and stringent, interpretation, as it is the fault of the buyer who asks for or receives a warranty, if it does not cover as much ground, and give him as effectual protection, as he intended." 1 *Par. on Con.* 459. The language of this warranty is, " I warrant the title of the above named negroes, and that they are slaves for life." That " they *are* slaves for life." In other words, that I sell you these negroes ; the *title* to them, *as slaves for life*, is in me, and I transfer to you my title. Their *status at the time of sale* is that of slaves for life. No words *implying a future state, or condition*, are used ; they are words applicable to the *present time* : they are not, they will or shall continue slaves for life. No such language is used, nor can the language used, by any fair and reasonable construction, be made to apply *to the future*. It undoubtedly has reference to the *present* status of the negroes—their condition *at the time of sale*. We do not mean to say that a party cannot warrant against a future event; that he cannot warrant against the act of the government, even, and make himself liable on his covenant ; indeed, the inclination of our minds is in favor of his ability thus to bind himself : but we do not think the parties understood this covenant, at the time it was made, as creating any such liability. It is the ordinary contract of a sale of slaves on time, and the bill of sale such as is very common in many portions of the State.

We find, neither in the papers nor in any other portion of the evidence, anything to take this case out of the ordinary rules applicable to cases of bargain and sale. Here was a delivery of the chattel, a covenant that the condition of the property was that of slaves for life, a transfer of the title to the purchaser, and, by the law, the property passed to him. 1 *Par. on Con.* 435--6, *and note*. There is no complaint that the purchaser, at the time he purchased, failed to get what he contracted for. When placed in possession, under the covenant contained in this bill of sale, it is not disputed that the negroes *then belonged to him*, and that they were, under the law, slaves for life. But it is said, and admitted by the

warrantor to be true, that by the *subsequent* action of the Government the title of the purchaser has been divested, and the negroes set free. Upon whom must the loss occasioned by this action of the Government, in this case, fall? We think, most clearly, upon the party *who owned the property to be affected, at the time of emancipation.*

It is argued, however, that it is wrong to compel Hand to pay Armstrong for these negroes, after they have been taken from him by the action of the Government. He proposes to pay hire for the time he had control of them, and insists that upon doing so, he should be discharged from further liability. We sympathize with this party, as well as with all our citizens, who has thus lost his property without any fault on his part. We do not know any law, however, which makes it our duty to compel Armstrong to compensate him for his losses in this behalf. *The negroes belonged to Hand, not to Armstrong,* and why then should Armstrong make good the losses of Hand? It is said, because Armstrong held a note on Hand, given for the purchase money of these negroes. This is no *legal* reason. Hand owned the negroes, and Armstrong was entitled to the price. If Hand had paid the notes, according to contract, there would have been no controversy; unless it be insisted that every one who has warranted the title to a negro, is liable to an action for breach of warranty. This Court has said in a case where a breach of warranty of soundness was insisted on as a defence to a note given for a negro, "that the damage to be *recovered* or *deducted*, (*for there is no difference whether the damaged party sues or is sued*) is the difference between," &c. *Hook vs. Stovall, Dunn & Co.* 30 *Ga. R.* 420. We are not prepared to hold that every one who has at any time sold a negro and warranted the title, is liable to be sued for damages because of this action of the Government.

It is insisted that this covenant was intended to apply to the future condition of the slaves, or the words "slaves for life" would not have been used. We have already stated that these words were used to describe the then present status

of the negroes; they were slaves for life in contradistinction to slaves for a shorter period of time. By the laws of some of the States, slaves were freed on arriving at certain ages; by the laws of others, free negroes, for crime, were sold into slavery for certain periods of time; and this covenant was introduced to guard against frauds in the sale of such negroes, and all others whose legal status was to be that of freedom at some future time; and it was to insure the covenantee in the possession of his property, as slaves for life, rather than as slaves for a shorter period. By reference to the case of *Ponder vs. Cox*, 26 *Ga. R.* 485, the reason for this species of warranty will be seen, and doubtless cases similar to that gave rise to this form of warranty. This view of the history of this warranty makes it very consistent with the construction we give it. The seller warrants the title of the slave, and that he belongs to that class who are slaves for life, rather than to that of slaves for a term of years.

From what has already been said, it will be seen that we approve the first and second charges given; and these were sufficient to entitle the plaintiff in the Court below to a verdict for the amount due on the notes in controversy. This being so, perhaps it may be as well to express no opinion as to the correctness of the third charge. The question embraced in that charge is one, perhaps, of some difficulty; and as its decision is not necessary in this case, we prefer to meet it when we can not avoid it. The decision we have made disposes finally of the case.

Judgment affirmed.